Thank you. In this case, my client, David Lillie, has a jury verdict for $1.5 million, but the attorney fees and interests have not been adjudicated yet, so maybe we'll get to that $1.8 million eventually on remand. Not yet, no. The jury awarded this relief to David Lillie under three separate whistleblower protection statutes, and I'd like to start with the False Claims Act because the other two laws actually have a wider scope of coverage that will make the analysis easier once the False Claims Act issue is addressed. And today, the False Claims Act has two prongs of protection, but the second prong was added by an amendment in 2009, so many of the older cases in this area were looking only at the first prong, which protects acts in furtherance of an action under the False Claims Act. So it was tethered to the action for relief under the False Claims Act. But in 2009, as part of a movement of other whistleblower laws that Congress was enacting to enhance whistleblower protections and try to build a culture of corporate compliance in this country after the Enron scandal, they expanded this scope of protection to include an effort to stop one or more violations. So this provision is untethered from the actual proceedings in a False Claims Act, and it looks to trying to prevent these violations from actually arising in the first place. What violations here do you contend that your client's actions were intended to prevent? Well, in this case, he had the belief that his superiors were having him use Lockheed Martin proprietary files without Lockheed Martin permission. Okay, so assume that he reasonably believed that for the moment. Yes. We can get to later whether he had a reasonable basis for believing that. Tell me why that fits within one of the violations specified by any of the acts that you rely on. Well, it arises from Charles Brown's instruction to David Lilley. No, I understand what it factually arises from. I'm asking you a legal question. Yes. The acts prohibit him being punished for revealing something, an abuse of power. Things like that. Tell me what thing in the acts you think he was revealing. He was revealing an attempt to make a false statement in his memo. The work product of this engineering study is a worst case analysis that's documented with a memo, and they were going to cover up the fact that they were using these Lockheed Martin files by deleting the references to that. Why was that a false statement? You don't dispute that the facts stated, which is the information that came from the MagCorp files, was accurate. What you're saying is they just covered up where it came from. Why is that a materially false statement? Well, first let me say that the 2009 amendment specifically took away the requirement that you establish materiality because the idea is you want to stop violations before they become material. Okay, so what's the violation? I'm still back to struggling with what's the violation. What's the false statement here? The false statement is the attempt by his superiors to pass along the work product of Lockheed Martin as if it was their own, and that simply was not the case because Dave Lilly knew that he had to use the Lockheed Martin files. I'm missing something here. Yeah. I look at what looks to me like the critical email here from David Lilly to Eric Berg on October 8, 2014, and he says that IOM, the numbers, is based in part on some Lockheed generated Mathcad spreadsheets that may be Lockheed proprietary, most likely not. And then he heard that such Lockheed proprietary documents are forbidden to contractors, hearsay. However, the Mathcad spreadsheets are from a prior mission, Juno, and are not marked as Lockheed proprietary. So it looks like he's not even saying that he thought they were proprietary documents. Also, I'm having trouble understanding, as Judge Hurwitz asked you questions about, exactly what the fraud or false statement is. All a Mathcad spreadsheet is is a checking device, and when Lockheed was asked, they didn't say you can't use them or you have to use them. All they said was, you don't have the power supply you need to use them. And then... That's not all that Lockheed Martin said. Linda Facto specifically said that they were prohibited by Lockheed Martin to use them. Where is that in the record, a statement by Lockheed Martin, if they were prohibited from using them? You can just tell us, give us a record site, because I haven't seen that. Yeah, I didn't see it either. In the excerpts of the record, page 110. This is page 71 of the transcript, line 10. She got a response from Lockheed Martin, and she related to Chaw Brown, contractors are forbidden to use these files. That was the testimony at 110. And getting Judge Kleinfeld to your question, yes, I do agree, he was equivocal about... And frankly, David Lilly thought this was a relatively easy to resolve matter, just by resolving the provenance. But he goes on, and at the end of the second paragraph, he specifically raises the concern about fraud when he says that Chaw Brown asked him to use the files covertly. I noticed that, and I was about to get to you with that. All I could see about that is that it would really excite a jury, because it sounds like something out of a movie. But using the files without saying you're using the files, I'm still having trouble figuring out what the fraud is. I mean, I'm thinking what a Mathcad file is. And frankly, I've never used that app, because I'm not an engineer, I don't need to. But as I understand it, all it is is a spreadsheet that can handle more complex mathematical notation and more complex mathematical calculation than the kind of spreadsheets we all use. And engineers like it, because it saves work and it checks work. Am I misunderstanding what it is? Yeah, they're more specifically designed to handle spatial relationships, which can become quite complex in engineering products. Oh, yeah, sure. Uh-huh. But here's where the violation arises. Is it basically a spreadsheet with the additional capabilities of being able to handle more mathematical notation and more complex calculations than an ordinary spreadsheet? To be honest with you, I have never worked with Mathcad files. I'm not an engineer. My understanding is they're quite a bit more complex. Oh, I figured you probably would have rented it for a month in preparing the case and no, that did not happen. But take a look at the previous section of the False Claims Act, which outlines the violations. 31 United States Code 3729. And if you look at paragraph A1B, it says that it's a violation to knowingly make, use, or cause a false record or statement material to a false claim. But I'm still back to this question. Where's the false record or statement? There's an omission here, which is to say the internal memorandum, which let's treat it as if it's a statement to the government for the moment. This internal memorandum doesn't say what the source of the material is, but nobody's contending the material's inaccurate. So what's the false? If I say to Judge Bumate your car was going 60 miles an hour yesterday and I don't disclose to him how I got the information, does that make my statement false if he was actually going 60? I don't think that's really so analogous here. May not be, but what's the false statement? Yeah, let me get to that. If Mantech and JPL had gotten away with this, what was to stop them from billing the government for the work of preparing that MAFCAD file that Lockheed Martin had already prepared? Well, and if they had done that, if they'd done that, you'd have a really good claim. My question is- And how does David Lilley- That would be an ironclad false claims act. Yeah, that's right. My problem is I'm still focusing on what the false statement is anywhere. It's just an omission. It's just an omission of where apparently accurate information came from. Well, the deletion of the references, David Lilley understood that to be a misrepresentation about the provenance of the data he was using to conceal the violation of Lockheed Martin rights in this matter, after he had been specifically trained by Linda Facto in the impromptu meeting that they needed to be compliant and respectful of these Lockheed Martin rights. And this is what his central concern was. He was afraid for his security clearance that it would get yanked if the government found out he had participated in this false representation of Mantech's work when it was really the work of Lockheed Martin. And he wanted to stop this cover-up, this covert use of these files. Well, here the what you call covert use, just a use of a spreadsheet that somebody else had built in the Juno project rather than this one, it looks like it's cutting his employer's bills to the government instead of expanding them. This employer's on a time and materials contract and if they can piggyback some of their work on work that's already been done in the Juno project, they spend less time, it costs less money for the government. What's the problem? Well, David Lilley had no training that that was actually involved in savings to the government. And that's precisely the concern I raised, which is that David Lilley wanted to make sure that they were not cutting corners and doing this work properly. And based on his training, he had no way to know that they were not going to submit the work and then charge as if they had not saved that money. He didn't know, but his efforts to stop that were there. You're saying there's a False Claims Act claim, or at least the expanded Whistleblower Protection Act claim, where the employer is not ripping off the government, the employer is saving the government money, but the employee suspects they may rip off the government, even though he's never said that he thought they may rip off the government. He never said that they were charging the government for the work that the spreadsheet saved. But you're saying that if he thought maybe there's something fishy going on and they might rip off the government, that's enough for the Whistleblower Protection Act. Exactly. I like to look at it as the direction you're pointing in. And his actions in refusing to sign off, or at least threatening to refuse to sign off on the memo, was pointed in the direction of compliance. He was pointed against a fraud to misrepresent the provenance of the work he had done. And that is why it's protected. Congress specifically expanded the scope of the False Claims Act in 2009 to protect people who are trying to nip a fraud in the bud, to stop it from getting to the point where it'd be submitted for payment to the government. Mr. Renner, can I ask, what is the evidence that Mr. Lilly was fired because of whatever he did, other than the proximity in time? Well, for the Defense Contractor Whistleblower Protection Act, of course, proximity in time is enough to establish this contributing factor. Well, I want to ask you about it. Answer my question first, and then I'll ask you the second question. Under the False Claims Act, to me, the most persuasive evidence of the causation is in the animus. When Chaw Brown had David Lilly walk into her office and ask, you know, when are we going to resolve the provenance of these MAFCAD files? And she turns her back on him and says, you know, I'm going to have to work or work on that, and turns her back on him until he leaves the office. You know, that I think... So, your evidence is her turning her back on him and the proximity in time? Well, and then there's the dispute between David Lilly and Eric Berg about what happened after the Berg email. David Lilly says that Eric Berg sent this email a half hour later saying, come to my office. David Lilly went to the office and Eric Berg wasn't there. Eric Berg says, oh yes, we had a meeting, but he can't remember anything of substance. But I don't see how that establishes that he was fired because of whatever protected actions he took. It just establishes that they have a dispute about whether or not they actually had a meeting. So, if I turn to the... He comes to the meeting and the higher up that's supposed to meet with him isn't in his office? Yeah. Did he stay there long enough so that if maybe the higher up had gone to the bathroom, he'd have time to come back? I frankly don't know, but I think the jury could... So, it could be that we're making a big covert spy story thing out of some guy going to the bathroom? It's more than just that. You've got the timing, the animus, the resistance to addressing this issue, and then the attempt to use a pretext to cover up. And then they... I want to get back to the proximity and time, because that was the question I wanted to ask. You can answer this factually. We don't have to argue about it. I can look at the cases. He was fired when? He was actually fired in February of 2015. That was two months after he'd been furloughed. And normally, Manatech wouldn't go to that extra step of firing someone. You answered my question. Now, my second question is, when did the protected conduct, in your view, take place? In my view, it took place starting in August and continuing through October. That's essentially what your brief says. So, what you're saying is the proximity that the causation is shown by a firing in February for conduct that ended in October. Well, yes, but in this context, you also want to... Yes. Yes, but the furlough in December is also relevant, because it shows a pattern of antagonistic behavior. Well, are you claiming that he was furloughed? Yes, he was furloughed in December, but the jury... No, are you claiming that he was furloughed? He was going to be furloughed anyway. Okay, so you're not claiming that he was furloughed because of his protected conduct. He was going to be furloughed anyway. So, what you're... But as part of the evidence, the jury considered it, considering the pattern of activity, and then you definitely need to look at the April decision by Mantech to deem him ineligible for rehire. That is what has ruined his career. Okay, but that would make the... You don't want me to use that, because that makes the proximity less proximate. We'll go from October... So, look, I just need facts here from you at this point. Your proximity argument is, he did something in October, and they took the adverse action in February. Is that your proximity argument? Yes, but that's not all of it. You have to look at the whole context of evidence, the whole record... Okay, tell me what earlier adverse action they took against him that counts before February. Well, the resistance to his concerns that they wouldn't... That's not an adverse action. A resistance... Resistance is... You're a professional in this area. Resistance to his concerns is not an actionable adverse action. The adverse action you're suing because of is because he was fired. Yes. You're not suing because somebody gave him a rough time one day. You're suing because he was fired. That's right, but it's evidence of animus. That's the evidence of causation, that they were against his concerns. You keep answering the question that I asked two minutes ago. Yes, I'm mistaken. Your proximity argument is based on the proximity of October to February. Yes, but there's other evidence in the timeline. Proximity. Just proximity. Just proximity. Just proximity, yes. Okay, that's... There's other evidence in the timeline that connects the dots, and the jury rightfully drew the inferences. I understand. But if we only had proximity, we'd be dealing with October to February. That is one way of looking at it, but I do think there are other ways to look at causation. Okay, fair enough. Counsel, I have one quick question. Do you agree that the district court got the standard wrong for abuse of discretion under the Defense Contractors Whistleblower Act? The district court cited a standard for it that I don't think is the one that's in the statute. That's not fresh in my mind. So if you could be more specific, which standard are you addressing? Well, the district court described the standard as requiring the federal official to have, to gain personal gain or advantage to himself or preferred other persons. The statute doesn't require that at all. It just requires an arbitrary capricious exercise of authority that is inconsistent with the mission of NASA or their successful performance of an administration contract or grant. Yeah, if you look at page 50 of our brief in the addendum, it goes over the various categories of protection, and they're quite a bit broader than what the district court had allowed. It includes, for example, a violation of law or abuse of authority, which I think sweeps in the concerns that David Lilly expressed here. So under the correct standard, does your client have enough evidence to beat J-Mal on that abuse of discretion? Absolutely. In addition to the issue about the False Claims Act, he also has concerns about just violation of law in violating Lockheed Martin's proprietary property. It's a violation of the Defendant Trade Secrets Act. There's also a California Civil Code that violates Civil Code 1709 on deceit. So it's a much broader range of protection to draw on, disconnected from having a viable False Claims Act proceeding. Okay, thank you. Thank you. We've taken you way over, but we'll give you a little bit of time for rebuttal at the end. Counsel, you may proceed. Good afternoon, your honors. Brian Tully McLaughlin on behalf of Mantec. Can I ask you to start where Judge Bumate left off? Because it seems to me that the district judge's definition of abuse of authority was incorrect. That the act, the Defense Contractors Act, defines abuse of authority differently than the way the district judge did. Tell me if both Judge Bumate and I correctly read the act that way, and if so, what the effect of that is. I do not read the act. I'm trying to pull the act yourself right now. It has a definition. It defines the term, does it not? It does talk about an arbitrary and capricious exercise of authority. Yes, okay. And the judge instead reads a definition to the, applies a definition that appears to be derived from places other than the act, which doesn't seem to match up very well. And I think those are just facts. So the question is, what's the consequence of that? There's no consequence in terms of the propriety of the judge's ruling for a few reasons. One, I think it's important to note that this argument that we just heard was not made in front of the district court. Mr. Lely did not argue that his conduct was protected because he was reporting an abuse of authority. So that's one. But also, even under that standard, arbitrary and capricious is a very high standard. And we go back to the basic analysis that the and she did so with respect to each one of these causes of action. Counsel, how did Mr. Lely not make that argument if the district court ruled on it? The district court, I would submit, was generous by painstakingly going through every single part of the causes of action. However, at the real quick hearing, she pointedly asked Mr. Lely's counsel what his theory was in terms of a violation under the Defense Contract of Whistleblower Act Protection Act and what the evidence was for that. And at no point did he raise that this was an abuse of authority. No, but that's a legal conclusion. So I guess my question is, assuming it wasn't waived, why wasn't, does the evidence at trial, taken in the light most favorable to Mr. Lely, establish an abuse of authority? Or any of the other things in the Whistleblower Act that might give rise to liability? I think abuse of authority is the only one, because I don't think there's any plausible allegation here of a violation of the law, although maybe Mr. Renter can enlighten me. I think at the end he was saying there was. But let's focus on abuse of authority. Is this, let's assume that everything he says is true. Was he reporting an abuse of authority, or merely a possible breach of contract between JPL and Lockheed? The latter, your honor. The individual who Mr. Lely believes was acting inappropriately was a JPL employee. So in the first instance, we're not talking about someone who has authority within the agency at issue, which is NASA. We're not even talking about somebody. Well, except you said nobody else. Counsel, help me on something here. Help me on something here. I read this expansion of whistleblower protection in the DWCPA, or whatever the acronym is, and it's really vague. All he needs is to reasonably believe, he doesn't have to be right, that, and to disclose to a person or body described, evidence of gross mismanagement or abuse of authority. An abuse of authority is any arbitrary and capricious exercise of authority and consistent with a mission, or arbitrary and capricious exercise. Well, they're not different things. Now, what he apparently believes, it's a little hard to say, because some of this stuff sounds a little excessive, but what he apparently believes is that his company, Mantek, is using proprietary information of Lockheed's without permission. And he's disclosing that, he's making a fuss over it, and he thinks he's being ultimately fired and made ineligible for rehire, because he raised that issue. Now, what I want to know is, it seems like, since he doesn't have to, he doesn't have to prove that he was right, just that he reasonably believed it, and based on the ambiguity in the emails, he might have reasonably believed that they were using proprietary information, and I would think that they would have to, in order to turn square corners, they'd have to get somebody to talk to Lockheed and pay them enough so they could use the spreadsheet from the Juno project with permission. Why isn't that gross mismanagement or abuse of authority to punish him by making him ineligible for rehire, because he, if they in fact did, that's the separate issue that Judge Hurwitz asked about, but why isn't it a gross abuse of authority or gross mismanagement or abuse of authority to cover up that they're using Lockheed's proprietary information or proprietary spreadsheet without permission? As to gross mismanagement, first I'll address the cases that interpret that standard are that gross is beyond all reasonable measure, and that it's an action that creates a substantial risk of a significant adverse impact on the agency's ability to accomplish its mission. Impact on the agency really matters. What case are you referring to there? It was cited by the district court and... Just tell me the case so I can look it up and read it. It's the Swanson case. Swanson, okay. It's at ER 37, and that interpretation or definition has been approved by Congress, and I think the analysis is... Oh, there's... When you say the definition in that case has been approved by Congress, what do you mean? Are you referring to their statute? Congress made an amendment to the original Whistleblower Protection Act, Section 2302, and incorporated that definition. Yeah, that was the issue we were talking about before. The definitions are in the statute here, are they not? Yeah. So what you're saying is that that case set out the language that is now incorporated in the definition section of the Defense Contractor Whistleblower Protection Act. So that really hasn't moved us forward. Help me more on my question. Why isn't covering up use of proprietary information within that definition? Well, Mr. Lilly's concern, as seen in the email that we discussed, was whether or not he had access to the... Whether or not he was permitted to have access to Lockheed's files. So that needs to be clear first. Yeah, he thinks he may be left holding the bag for some kind of misuse of proprietary information. So he starts fussing about it, so he won't be left holding the bag. At least, that's how I read the record. But what he doesn't connect or provide any evidence of, as your honors have discussed, is what it was that JPL was doing that would then show mismanagement, gross mismanagement. Oh yeah, he does. He does provide evidence of that using the spreadsheet without saying that it was the spreadsheet that Lockheed had developed for the Juno project that was proprietary. I understand that, but the issue is whether or not that implicates gross mismanagement of the NASA contract. That is indeed the question, and I want to know what the answer is and why. The answer, your honor, is that it does not because this is, at best, a breach or a violation between two subcontractors in terms of their agreement. It's not a violation or implicated violation of a contract or a requirement with respect to NASA, to the agency. And there's been no evidence submitted of that. So to the extent that there's an unauthorized permission or inappropriate action by this JPL employee, that doesn't necessarily rise to the level of mismanagement, and it certainly doesn't rise to the level of gross mismanagement. Why not? There's a lot of secrecy about space because of the potential military implications of space travel, space flight. And so why isn't any misuse of anything potentially troublesome to the government? I think in part because that would open up this statute to everything under the stun. And that's not what this statute does or the other ones. It would just mean that when you're working on a defense contract, you turn square corners. There's proprietary information. You get it in writing that you're allowed to use it. That's all it would mean in the context of this case. I understand that. Again, the issue here is how this implicates the NASA and its funds. And we don't have any indication that JPL was going to use the memo and call it its own work product or something of that nature. I would point out that JPL... I understand. My question was not just about the money, because I think there's nothing in the record to suggest anything other than that Mantec was going to save the government money by saving itself time by using this spreadsheet. Actually, what aroused my interest more was the potential military and risk of anybody going beyond what they're allowed to use and something like a spreadsheet circulating beyond where it's supposed to circulate. Engineers use these spreadsheets to check their calculations that they've made by other means and to make calculations. And we probably wouldn't want the Russians or the Chinese to have the Juno spreadsheet. Where did the memo go, Counsel? This information was put in an internal memo. Where did it go? From whom to whom? That's correct, Your Honor. It's an internal memo that was being delivered to another JPL employee, Linda Facto. And that's all that the record shows. Okay, so it was not a public document, but an internal memo in JPL? I believe there may be evidence in the record that some version of that memo may have... Now, my question following up on Judge Kleinfeld's question is, I take it there's no contention in this case that the information was anything but proprietary information of Lockheed. In other words, there's no contention that it was government secret information, is there? No, there's not. So if Lockheed wanted JPL to have it, that would be fine. As I understand, Mr. Lilley's argument was that Lockheed didn't want JPL to have it, and they were circumventing that agreement. But there's no argument that somehow this information was subject to non-disclosure except because of whatever agreements Lockheed and JPL had, right? That's exactly right, and that was the point I was trying to make. Okay, so getting back to the original point, let's assume that Mr. Lilley reasonably thought that JPL was ignoring its obligations to Lockheed under the confidentiality agreement they had. I know you don't think he reasonably thought that, but I'll assume that for purposes of my question. Is that an abuse of authority? No, I don't think that it qualifies as an abuse of an authority. Why not? Well, for starters, because it's not an abuse of authority by a NASA employee. And secondly, because any time that it – if we make – if the standard for abuse of authority is whether an employee makes a mistake or violates a contractual agreement, one between private parties, then the act is opened up. There's no end in sight to it. Well, except the act only requires that it be related to a federal contract. And you're – and JPL is – you stipulate it as a federal subcontractor here that's federally funded. So I'm not sure why the fact that JPL isn't itself technically a federal – isn't technically NASA makes any difference. Why does it make a difference? It makes a difference, but I wanted to note that under the definition, gross mismanagement, for instance, is – No, I don't think it's – gross mismanagement – I wasn't asking about gross mismanagement. I think the word gross there means really, really bad. I'm talking about abuse of authority. Yes, it has to relate to funds. And that takes us back, I think, to whether this concern actually relates to the funding of the NASA contract. So can I take our – if we were to hold that the district court applied the wrong standard for abuse of authority, is your position that we would affirm anyway because it was waived? Yes, you should affirm for several reasons. And one of the most clear, and that's very important to this court, is the issue of notice. First of all, the district court ruled on each one of these causes of action that Mantec was not on notice of any protected conduct. Mr. Lilley did not challenge that finding with respect to any cause of action in his appeal, and we pointed that out. So that, first of all, is an express waiver, and the district court's opinion has to be – would that mean as – putting it in concrete terms – that Mantec didn't know he'd gone to the two congressmen, Judy Chu, and I can't remember who the other one was. So it can't very well have punished him for going to those two congressmen since he didn't know it. Is that what you're saying? Well, I agree with that, and that was part of our argument. But what I was saying is that Mr. Lilley didn't challenge at all the district court's reasoning and conclusion as to the element of notice, which is a required element, under each one of these three codes of statute. Okay, what were the claims of – what were the disclosures claimed that it did or did not punish him for? Yes, and I'm glad you brought that up. The only disclosure that – or the only conduct that Mr. Lilley relies on or relied on in front of the district court – I think their email, the October email that Your Honor quoted from earlier, because that email was sent to Mr. Lilley's supervisor, Mr. Berg. The district court expressly asked Lilley's counsel at the Rule 50 hearing what evidence he relied on for approval of claims, and the only evidence he relied on for notice was the Berg claim. Wait a minute. The statute says that the abuse of authority has to be for disclosure to a person or body described in paragraph 2. In paragraph 2, it says, Member of Congress, Inspector General, Government Accountability Office, Employee of the Department of Defense, Authorized Official of the Department of Defense. That's why I focused my court or grand jury or management official. And obviously, I focused on Judy Chu because she's a member of Congress. So what you're saying is we should just look at management official or other employee of the contractor? That's the only disclosure at issue? The only disclosure that's related to whether Mantech was put on notice. I would certainly concede, as the district court applied its reasoning in this way, that Mr. Lilley's later disclosure to the congressional official would be relevant to whether or not he had a subjective belief, as well as an objectively reasonable one, that he was engaged in. So are you saying they punished him for going to the ethics committee? No, I'm not. I am saying... Oh, you're saying they didn't punish him for going to the ethics committee. I'm trying to fit what disclosure he made that's within this definition in subsection two of the statute, A2. A2, as you pointed out, refers in subparagraph G to an employee of the contractor. Yes, you're talking in abstract terms and I'm trying to relate it to the record so that I know concretely what it is that we're arguing about. The only disclosure that would qualify is the disclosure to Mr. Berg, his supervisor. And the reason is because the other disclosures were not ones that Mantech was aware of. And so while they could qualify in theory to show protected conduct, they don't have any relevance to the issue of notice. And that's a separate... Well, I'd be a compliant to the ethics committee. But you didn't know about that? Correct. The complaint to the JPL ethics would be relevant to the objective reasonability of Mr. Lilly. But it was not. There's no evidence to show that Mantech was aware of that complaint. Now I understand what you're saying. And the district court noted this expressly in its opinion. And to the extent that that council is trying to undo that now, it's far too late. But either way, there is no evidence to show that Mantech was aware of that JPL ethics complaint before it terminated Mr. Lilly. Okay, unless one of my colleagues has other questions, we'll put a couple minutes back up for Mr. Renner. Who should unmute himself? Thank you for that. The requirement for David Lilly is to show that the employer had knowledge of protected activity. And the Berg email is sufficient to accomplish that requirement. There is no requirement... The Posting Council is saying you didn't argue that in front of this court. I mean, well, yes, the Knox case from the Fourth Circuit is in our brief on this issue. He has to have a reasonable belief in the violation, but there is no duty that he explain the reasonable belief to the employer. All he has to do is show the employer had knowledge of protected activity. And the Berg email more than suffices for that. As does... You're talking here about the October 8, 2014 email, right? So you're saying the reason the company made him ineligible for rehire was because he wrote this email to his boss October 8, 2014. I don't think that describes the whole record because after he was fired, there were issues about the return of his equipment and property. And Congressman Chu's office arranged for that. So at that point, when they deemed him ineligible for rehire, by that point, they had knowledge of his communications to a member of Congress. But I want to go back to what your colleague argued. The only report that would give rise to liability in your view, or am I wrong, is the report to his supervisor. At least for his firing. At least for his firing. His report to the JPL person is not the qualifying report. It's the report to his... I acknowledge that we don't have direct evidence of knowledge about that. That is something the jury is permitted to infer from the fatality of circumstances and the deviation from normal practice, that they normally don't fire someone after furloughing them. No, but I'm trying to figure out what evidence was before the jury that he had made a report to the JPL supervisor. Well, he testified to making that report. But isn't that, is that a qualifying report? He wasn't fired for making that report because he fired for making that. He was fired for making the report to his supervisor, right? Well, I think the evidence permits inferences about a variety of the protected activities that lead up to the Berg email and the JPL. Well, see, that's why I'm having difficulty. I'm having difficulty with it factually. Put aside the report to Congress for a second. He goes to the JPL supervisor and says, gee, I don't think we're supposed to be using this information. And she says, in effect, at the end of the, you can but mask the source. So, I mean, he's not fired for talking to her. He's fired in your view because he went to his boss and said, I think there's wrongdoing going on here. All she says to him, she doesn't take any adverse action. She doesn't report anything to his boss. All he tells his boss, all she says to him is, yeah, go ahead and use the information to mask its source. So that's not an event that leads to a firing. It's the report to his boss that he's engaged in this stuff that leads to the firing, right? I think it's a mistake to try to parse protected activity this way. And the Fourth Circuit and DeMasters explain how it really is more appropriate to look at protected activity as a whole and the adverse action and then assess causation. And that's really the appropriate function of the jury is to consider the record as a whole and the inferences that are reasonable to draw from it. And I think that's the more appropriate way to analyze it rather than this type of piecemeal or dissection of the protected activities and the elements of causation. Now, I guess I'm asking a different question. I'm asking, if his boss had never found out that he reported to JPL, you would not have a cause of action here, would you? Sure we would. The Berg email itself is Mantek knowledge of his refusal to participate in the cover-up. That's protected activity under the Church's decision. Tell me how he made Mantek aware of his refusal to participate in the cover-up. I've looked at the Berg thing and it seems to be, well, maybe if I wasn't sure, I reported to them. And so now I'm reporting to you. Where is there something where he says, I'm refusing to take part in this cover-up? It's the last sentence right before his name in page 291 of the excerpts of the record. It says, this issue needs to be resolved before I can sign and release the IOM memo. That's his refusal, saying I need this resolved. And that was my last question. Did he sign and release the memo? He did sign the memo. Because his supervisor had signed it off and he came to believe that the issue had been resolved by that next day. So the opposing counsel suggests that even if we found that the district court used the wrong standard for abuse of discretion, you didn't argue that in the district court. Do you agree that you didn't argue that and does that argument waive? I think that, well, my co-counsel did not have the opportunity to respond to the judge's decision. This appeals the response to the judge's decision. And on the jury instructions, neither party made any objection to the jury instructions that are at issue here. And if you look at page 55 of the excerpts of the record, the jury was properly instructed on the standard for the defense contractor whistleblower protection act. And they made the finding based on the record as a whole. I, you know, we think that decision was correct. It was error for the, as a matter of law, for the district court to set that aside after the jury had been properly instructed and reached the decision based on the correct understanding of the law. And if I may just squeeze in two more points. You can squeeze in one. So go ahead. My client was not objecting to merely a breach of a contract with Lockheed Martin. They had patent rights at issue here. And that's in the record at pages 103 and 168 of the excerpts of the record where the testimony shows that these were patent protections of Lockheed Martin that were being violated. And of course, David Lilly was concerned that this was, you know, I think the reasonableness of his belief really flows from the training, particularly from Linda Facto's impromptu meeting on July 31. You know, from that point, he understood that there was, you know, law or at least a rule here that he had to obey. And that training comports with the protection for disclosing a violation of law or rule in the defense contractor law and the both counsel for their briefing and arguments. This case will be submitted.
judges: Kleinfeld, Hurwitz, Bumatay